## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOUIS WARD | : | |
|       Plaintiff, | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT | : | Civil No. 3:06CV01936 (PCD) |
| DEPT. OF PUBLIC SAFETY, ET AL. | : | |
|       Defendants. | : | |

_____

_____

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Louis Ward brings this action alleging discrimination on the basis of race, color and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and Conn. Gen. Stat. § 46a-60(3)(4), including allegations of disparate treatment, retaliation, and creation of a hostile work environment.  Plaintiff also brings claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1981 as well as a claim of Intentional Infliction of Emotional Distress.  Defendants, State of Connecticut Department of Transportation, Edward Lynch in his Individual and Official Capacity, Steven Madden in his Individual and Official Capacity, Alan Mattson in his Individual and Official Capacity, Vincent McSweeney in his Individual and Official Capacity, Eric Smith in his Individual and Official Capacity and Lucien St. Germain in his Individual and Official Capacity, move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to all claims.  For the reasons stated herein, Defendants' motion for summary judgment [Doc. No. 54] is **granted in part and denied in part.**

## I.      Background

Plaintiff Louis Ward is an African-American, Black male residing in the State of Connecticut. (Compl. ¶ 9.)  Plaintiff is currently a Sergeant with the State of Connecticut Department of Public Safety, hereinafter referred to as the "Agency".  Plaintiff has worked for the Agency since 1988.  In 1988, after completing the Training Academy, Plaintiff Ward was assigned to Troop H in Hartford.  In 1996, he was transferred to the Casino Unit and in 1998 was transferred back to Troop H.  In 1999, Plaintiff was promoted to Sergeant and transferred to Troop I.  In 2000, Plaintiff was transferred to Troop H and in 2004 to Troop C. (CHRO Compl. Ex. 12 at Ex. H.)  Plaintiff was subsequently transferred to Troop K and is currently working in Troop W.

Plaintiff has several Federal Aviation Administration pilot certificates and has been a pilot since 1980.  Plaintiff currently holds an airline transportation pilot certificate, a gold seal instructors certificate and an authorization to instruct multi-engine land and single engine sea planes. (Compl. ¶¶ 24-27.)  Since 1981, Plaintiff has also maintained a current medical certificate. (Id. ¶¶ 25-26.)

At all times relevant times, Defendant Lucien St. Germain was employed by the State of Connecticut Department of Public Safety as Master Sergeant of Troop H in Hartford.  He supervised the Plaintiff between 2002 and 2004.  Defendant Alan Mattson is a former Master Sergeant who also worked at Troop H in Hartford.  Defendant Steven Madden is a Master Sergeant in the Agency.  Madden investigated and drafted the final report for internal affairs investigation No. 03-092, concerning Plaintiff's report on Trooper McWilliams' car accident. Defendant Eric Smith is a Major with the Agency and Commanding Officer of the Central District (which includes Troop H in Hartford).  Defendant Vincent McSweeney was employed by the Connecticut Department of Public Safety, first at the Central District and later at headquarters.

2

Vincent McSweeney was a Lt. Colonel and held the position of Commanding Officer in Middletown/Meriden.  Defendant Edward Lynch was the Commanding Officer of the Agency for most of the relevant time period.  Prior to Lynch's appointment as Commanding Officer, he was responsible for personnel matters within the Agency as the Commanding Officer of Field Operations.  Lynch also signed internal affairs report No. 03-092.  (Id. ¶¶ 10-15.)

Between 2002 and 2004, Defendant St. Germain rated the Plaintiff satisfactory and very good on his yearly performance reports.  St. Germain also issued Plaintiff positive and negative Performance Observation Reports, which are based on performance in a specific instance.  (Def.'s Rule 56(a)(1) Stmt. ¶¶ 35-37.[1])

Plaintiff alleges that over the past four years he has received discriminatory and unequal treatment in comparison to similarly situated White Sergeants.  Plaintiff claims that since 1990, he has consistently applied for pilot and observer positions with the Agency's aviation unit but that he has not been transferred due to racial discrimination. (Id. ¶ 8.)  In 2000, Plaintiff applied to the aviation unit but subsequently withdrew his application following communications over his use of sick leave. (Def.'s Rule 56(a)(1) Stmt. ¶ 42.)  Plaintiff applied to the aviation unit again in January 2002 and 2005. (Compl. ¶ 28.)  In April 2002, Plaintiff's counsel wrote a letter to the Agency contending that Plaintiff was denied a transfer to the aviation unit for "impermissible reasons." (Def.'s Memo. in Support of Summ. Judg; CHRO Report Ex. 12 at Ex. A)  Defendant denies that the failure to transfer was race-based.  Defendants argue that for each time Plaintiff applied to the aviation unit, he was not hired for legitimate reasons, including lack of enough flight time,

---

[1]Unless otherwise noted, citations of fact from Def.'s Rule 56(a)(1) Stmt. were admitted as true in Pl.'s Rule 56(a)(2) Stmt.

inexperience with helicopters and that no one was hired.   (See Def.'s Memo. in Support of
Summ. Judg. at 41-43.)

Plaintiff also alleges that he has received discriminatory treatment in relation to discipline,
evaluations, and internal affairs investigations ("IAs"). While at Troop H in Hartford, Plaintiff, as
a supervisor, was assigned to investigate a one-car Agency automobile accident.  Trooper
McWilliams, an African American, was the driver.  Plaintiff prepared an accident report, finding
that mechanical error caused the accident.  Defendant Master Sergeant Mattson reviewed the
report and returned it to Plaintiff, asking him to correct deficiencies and justify his conclusions.
(Def.'s Rule 56(a)(1) Stmt. ¶ 9.)  Plaintiff argues that he was forced to change his conclusion
concerning the cause of the accident to reflect human error. (Pl.'s Rule 56(a)(2) Stmt. ¶ 7.)
Defendant Mattson gave Plaintiff's report to his supervisor, Defendant St. Germain, who
reviewed the report and recommended than an IA be initiated against Plaintiff.  In October 2003,
Defendant Madden conducted this IA, No. 03-011, and sustained charges of incompetency,
inefficiency and failure to submit a proper report.  (Id.)

As a result of this investigation, Plaintiff received discipline in the form of a two-day
suspension beginning on July 24, 2004. (Id. ¶ 13.)  Plaintiff argues that Defendant St. Germain
played a role in Plaintiff's discipline. (Id. ¶ 12.)  Defendant counters that Legal Affairs and Labor
Relations recommended discipline. (Def.'s Rule 56(a)(1) Stmt. ¶ 10.)
Plaintiff later filed a grievance and by agreement the discipline was rescinded.

Following the IA, Plaintiff was transferred to Troop C.  Defendants claim that this transfer
was non-disciplinary and was to provide Plaintiff with a "fresh start." (Id. ¶ 14.)  Plaintiff counters
that the transfer was a disciplinary action by the Defendants designed to remove Plaintiff from

4

Troop H, which was closer to his home. (Pl.'s Rule 56(a)(2) Stmt. ¶ 14.)

In 2003, Plaintiff was arrested by the East Hartford Police for an alleged domestic physical altercation with his teenage son.  Criminal charges against Plaintiff were quickly nolled. Defendant St. Germain recommended that an IA be performed.  The investigation concluded that Plaintiff failed to timely notify his supervisors of his arrest and Plaintiff received a reprimand. Defendant Lynch signed this report.  (Def.'s Rule 56(a)(1) Stmt. ¶ 16-18.)

Plaintiff claims three retaliatory and hostile investigations were initiated against him in 2005 and 2006 for alleged excessive force, false arrest and sleeping on duty. (IA/AI History Ex. 26.)  He claims the Defendants required him to submit more explanatories (written explanations of his actions) than his White colleagues and that he was yelled at and demeaned in front of his subordinates. (Compl. ¶ 83.)  He further asserts that Black Agency employees are subject to IAs more frequently than White employees. (Compl. ¶¶ 66-68.)

On March 2, 2005, after Plaintiff had left Troop H, the Agency held a meeting at which six minority troopers, including Ward, accused Defendant Mattson of discriminatory treatment. (Id. at ¶ 21-24.)

On February 1, 2005, Plaintiff filed CHRO complaint No. 0510291 and subsequently received a right to sue letter.  (Amend. Compl. ¶18-20.)  On July 25, 2006, Defendant filed a second CHRO complaint, No. 0730024 (CHRO Compl. Ex. 14), amended October 18, 2006. (Ex. 15.)  Defendant alleges that Plaintiff did not receive a right to sue letter for this CHRO complaint. However, the record reflects that the CHRO reviewed Plaintiff's second complaint on the merits and released jurisdiction. (CHRO merit assessment Ex. 16.)  Plaintiff filed the complaint in this action on November 29, 2006. [Doc. No. 1.]

## II.      Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©.  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).  The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

            In determining whether a genuine issue has been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.

1980).  Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury.  Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

"[The Second Circuit has] repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo, 22 F.3d at 1224.

## III.   Discussion

### A.   Personal Jurisdiction over Individually Named Defendants

Plaintiff brought this suit against the Individually named Defendants in their Individual

and Official Capacities.  However, as Defendants correctly argue, this Court does not have

jurisdiction over the individually named Defendants in their individual capacities.  The

Defendants were served via the Office of the Attorney General, which is sufficient for jurisdiction

over the Defendants in their official capacities.  Plaintiff concedes that the individual Defendants

were not served by in hand or abode service as required by Conn. Gen. Stat. § 52-57(a) in order to

effect personal jurisdiction over state officers and employees in their individual capacities.  (Pl.'s

Memo. in Opp. to Summ. Judg. at 13.)

       In a strikingly similar case, the Second Circuit recently dismissed claims against state

employees in their individual capacities.  The court held that because serving the Connecticut

Attorney General is insufficient to constitute personal service if these Defendants have not

authorized anyone to accept service for them in their individual capacities.  Bogle-Assegai v. CT,

470 F.3d 498, 502 (2d Cir. 2006)[2].  The Defendants in this case did not give such authority to the

Attorney General.  The court ruled that actual notice of the suit and participation in their official

capacity did not overcome the lack of service to effect personal jurisdiction.  Id. at 507.  Plaintiff's

counsel argues however, that he had good cause under F.R.C.P. 4(m)[3] for the failure and therefore

the lack of service should not destroy jurisdiction.  Plaintiff's counsel claims good cause because

he did not receive the file from Plaintiff's former counsel until the statutory period for service had

_____

       [2]Plaintiff's first attorney was also the Plaintiff's attorney in Boggle-Assegai and was
therefore was aware that service on the Office of the Attorney General was insufficient for
personal jurisdiction over Defendants in their individual capacity.

       [3]F.R.C.P. 4(m) provides: "If a defendant is not served within 120 days after the complaint
is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the
action without prejudice against that defendant or order that service be made within a specified
time. But if the plaintiff shows good cause for the failure, the court must extend the time for
service."

expired.  However, unlike in <u>Zankel v. US</u>, 921 F.2d 432, 436 (2d Cir. 1990), relied on by

Plaintiff, counsel in this case made no effort to correct the defect.  Plaintiff's counsel was aware

of the defect as Defendant pled lack of personal jurisdiction in its answer.  Counsel can show no

cause for not seeking to cure.  All counts against the Defendants in their individual capacities are

therefore **dismissed**.

### B.  Count I: Title VII

#### 1.  Exhaustion of Administrative Remedies

Pursuant to Title VII, a plaintiff must file a discrimination complaint with the Equal

Employment Opportunity Commission ("EEOC") within 180 days of the alleged discriminatory

act or, if the complainant has already filed the charge with a state agency, within the 300 days of

the alleged illegal act. (42 U.S.C. § 2000e-5(a)(e)(1).)  Plaintiff filed his first complaint with the

Connecticut Commission on Human Rights and Opportunities ("CHRO") on February 1, 2005.

Three hundred days prior is April 6, 2004.  Therefore, only discriminatory acts which occurred on

or after April 6, 2004 are actionable.

In <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122 (2002), the Supreme

Court held that with respect to "discrete acts of alleged discrimination... only those acts occurring

within 300 days of date that employee filed his charge with the EEOC were actionable."

However, under Title VII, an employee may recover on a hostile work environment theory for acts

occurring more than 300 days before the charge was filed with EEOC, as long as all the acts were

part of same hostile work environment and at least one occurred within 300-day period.

Furthermore, the charge filing requirement of Title VII does not bar an employee from using acts

prior to the 300 days as background evidence in support of a timely Title VII claim.  Plaintiff

concedes that the failure to transfer to aviation and each IA are discreet acts.[4]  (Pl.'s Memo. in Opp. to Summ. Judg. at 18.)

Defendant further argues that Plaintiff failed to properly exhaust his administrative remedies with regard to the allegations in his July 25, 2006 CHRO Complaint, amended October 18, 2006.  However, this complaint was addressed by the CHRO on the merits, the CHRO released jurisdiction (CHRO merit assessment Ex. 16) and Plaintiff pled exhaustion of administrative remedies. (Compl. ¶ 8.)  Therefore, all discrete acts since April 6, 2004 are properly before this Court.

## 2. Disparate Treatment

Plaintiff's discrimination claim alleging disparate treatment on the basis of race and color is analyzed under the three-step burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); St. Mary's Honor Center v.  Hicks, 509 U.S. 502, 519, 524 (1993).  A plaintiff has the initial burden of establishing a *prima facie* case of discrimination by showing that (I) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was performing his duties satisfactorily; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in that class.  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998).  A

---

[4] "It is well-established that transfers, demotions, failure to compensate adequately, and failure to promote are all discrete acts which do not constitute a continuing violation."  Crosland v. City of New York, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001); See also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

plaintiff's burden in establishing a *prima facie* case of employment discrimination is not an

onerous one; he merely has to present facts sufficient to give rise to a presumption of

discrimination.  See Burdine, 450 U.S. at 254; Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d

456, 467 (2d Cir. 2001) ("A plaintiff's burden of establishing a *prima facie* case is *de minimus*.").

A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful

discrimination, and the burden of production shifts to the defendant. Id.  If the defendant then

proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, Slattery

v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001), "the presumption of

discrimination drops out," Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001), and the

plaintiff must prove that the legitimate reasons offered by the defendant were "not its true reasons

but were a pretext for discrimination." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133 (2000)).  Where Plaintiff raises legitimate questions about whether the proffered

reasons are credible or convincing, that goes toward establishing that the reason is pretextual.

Meiri v. Dacon, 759 F.2d 989, 997 n.13 (2d Cir. 1985) (reasonableness of employer's justification

for employment action is probative on question of pretext).  At all times, the ultimate burden of

persuasion remains with the plaintiff to show that the defendant intentionally discriminated

against him.  Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 256).

Plaintiff is a Black African-American and is therefore a member of a class protected from

discrimination on the basis of race, color, and national origin.  Plaintiff performed his duties

satisfactorily.  His performance evaluations for the relevant period ranged from satisfactory to

very good. (Ward Depo. at 199.)

Defendants agree that Plaintiff's discipline and suspensions after April 6, 2004 are adverse

11

employment actions.  Plaintiff was suspended in July 2004 for two days following the IA

concerning Plaintiff's investigation of  McWilliams' car accident and therefore this suspension is

actionable.  Plaintiff also complains of an IA following his arrest for a domestic violence incident.

However, this IA was conducted and resolved in 2003 and therefore is not actionable. (Id.)

Plaintiff also mentions IAs for speeding in 1998 (Ward Depo. at 73) but these investigations are

time barred.

       In 2005 and 2006, Plaintiff was the subject of three additional IAs.  However, these

investigations did not result in discipline. (Ward Depo. at 97-98; IA/AI History Ex. 26.)  An

investigation or a finding of "sustained" (See Id.) that does not result in discipline does not

constitute an adverse employment action.  Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236,

248 (S.D.N.Y. 2001) ("courts in this district have found that reprimands, threats of disciplinary

action and excessive scrutiny do not constitute adverse employment actions."); see also Stembridge

v. City of New York, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000).

       Plaintiff alleges that the Agency's failure to transfer him to the Aviation Unit was an

adverse employment action.  Defendant counters that the Agency's refusal to transfer Ward to the

aviation unit is not an adverse employment action.  An adverse employment action is a "materially

adverse change in the terms and conditions of employment" meaning that a "change in working

conditions must be more disruptive than a mere inconvenience or an alteration of job

responsibilities." Galabya v. New York City Bd. of Ed., 202 F.3d 636, 640 (2d Cir. 2000).  An

adverse employment action usually includes termination, demotion, a decrease in salary, less

distinguished title, a material loss of benefits or significantly diminished responsibilities. Id.

       A failure to promote is an adverse employment action.  Dillon v. Morano, 497 F.3d 247,

251 (2d Cir. 2007).  Furthermore, in <u>Beyer v. County of Nassau</u>, 524 F.3d 160 (2d Cir. 2008), the Second Circuit found that a failure to transfer, even to a job with the same pay and title, constitutes an adverse employment action if the requested job was more prestigious or "highly desirable."  If a "reasonable trier of fact could conclude that the transfer would have involved objective and significant improvements in the terms, conditions, and privileges" of employment. <u>Id</u> at 165.  Here, a reasonable trier of fact could conclude that the aviation unit was more prestigious, was highly desirable and a better position than the position Plaintiff currently holds.  A job as a pilot in the aviation unit requires special skills and qualifications.  (Samson Depo. at 45-71; <u>see also</u> Ward Depo.)  It is a material question of fact whether these necessary qualifications made the aviation unit more prestigious and whether working in the aviation unit was advantageous for the furtherance of a Sergeant's career.  Furthermore, the aviation unit provides experience and training in aviation for only a select few.  A reasonable jury could conclude that a transfer to the aviation unit would have been a significant improvement for Plaintiff.

The circumstances regarding both Plaintiff's disciplinary action in 2004 and the failure to transfer Plaintiff (the two remaining adverse employment actions) give rise to an inference of discrimination based on race, color, and/or national origin.  No African American was hired into the aviation unit during the 18 years that Plaintiff continuously applied. (Samson Depo. at 37; Ward Depo. at 83.)  In regards to Plaintiff's suspension, Plaintiff points to Caucasian colleagues that he argues did not receive IAs or discipline. (Pl.'s Memo. in Opp. to Summ. Judg. at 25-27.)  For example, Plaintiff asserts that in February 2004, he was assigned to investigate a departmental accident of a White male, Sergeant Calvo.  Plaintiff asserts that Defendant Mattson changed the time of the accident on all of Plaintiff's submitted reports to favor Calvo and that unlike Ward and

McWilliams, Sergeant Calvo was not subjected to an IA for his accident. (Compl. ¶¶ 43-44.)  The circumstances under which Plaintiff received discipline are not perfectly analogous to Calvo's situation (Plaintiff investigated an accident, he was not involved in one himself) or the other colleagues he points to.  However, Ward illustrates enough instances of Black Sergeants and Troopers receiving discipline for mistakes in comparison to White troopers who made different mistakes but did not receive discipline (Ward Depo. at 238-254) to meet the only *"de minimus"* burden of establishing a *prima facie* case of discrimination.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

The burden then shifts to Defendants to state a legitimate, nondiscriminatory reason for the challenged employment actions.  With regards to Plaintiff's suspension in 2004, Defendants proffer the non-discriminatory explanation that Plaintiff failed to properly complete the report on McWilliams' accident. (Def.'s Reply Memo. at 9.)   Defendants St. Germain and Mattson both testified that the accident report needed many corrections (Mattson Depo. at 31-33) and that McWilliams' report of the accident had discrepancies with Ward's. (St. Germain Depo. at 43-44.) Defendants argue that the IA was necessary and the suspension deserved because Plaintiff did not support his conclusion that mechanical failure caused the accident with sufficient facts and human error actually caused the accident. (Mattson Depo. at 54; Madden Depo. at 49-51.)  Their explanation is reasonable as Madden, who did not initiate the IA, found that Ward's report was sloppy, not thorough and sustained most of the charges. (Madden Depo. at 49-51.)

As to Plaintiff's complaint regarding failure to transfer, Defendant offers non-discriminatory explanations for each time Plaintiff was not hired into the aviation unit.  Defendants claim that prior to 2000, Plaintiff did not meet minimum flight hour requirements. (Def.'s Memo.

14

in Support of Summ. Judg. at 41.)  In 2000, Plaintiff ultimately withdrew his application when the Agency questioned his use of sick days. (CHRO Report Ex. 12.)  Defendant argues that in 2002 Plaintiff's position and skills as a supervisor were more necessary in the field than in the aviation unit. (Def.'s Memo. in Support of Summ. Judg. at 41-42.)  Defendant also argues that Plaintiff was not qualified when he applied in 2005, as the focus on of the unit had switched to the helicopter, for which Plaintiff does not possess a license. (Id; McCullough Depo. at 27-30.)

Given that Defendants have articulated reasonable and non-discriminatory reasons for the adverse employment actions, the burden shifts back to Plaintiff to offer evidence that the Defendants' reasons are merely pretext for discrimination on the basis of race, color and/or national origin.  As evidence of pretext concerning Plaintiff's suspension, Ward points to a meeting at the commissioner's office to address allegations that Defendant Mattson treated minorities differently than Whites.  (Ward Depo. at 137-138; Mattson Depo. at 104.)  Chris McWilliams also attended this meeting and also filed complaints regarding Mattson's treatment of minorities. (Id. at 141.)  This might suggest that Mattson was motivated by race when he found that McWilliams' accident was caused by human error and that Plaintiff's report was faulty for not reaching that conclusion.  However, Defendant St. Germain initiated the IA  (St. Germain Depo. at 43-44) and Defendant Madden conducted the investigation and made the findings. (Madden Depo. at 35.)  Plaintiff offers no evidence that Defendants St. Germain or Madden based their decisions on race.  There is no evidence besides Plaintiff's own belief that St. Germain and Madden's proffered non-discriminatory explanation for the IA and suspension was pretextual.  Defendant Madden conducted a thorough investigation, including many interviews, before reaching his "sustained" conclusion. (Madden Depo. at 35.)  Furthermore, the suspension was recommended

not by Mattson or St. Germain but by Labor Relations. (St. Germain Depo. at 47.)

Although Plaintiff's IAs and discipline before 2004 are time barred, Plaintiff may use them as background evidence in support of a timely claim. Plaintiff argues a pattern of unwarranted discipline as evidence of pretext. However, Plaintiff is unable to show, and has no evidence besides his own beliefs and statements, that any other investigations or disciplinary actions against Plaintiff were pretextual. Plaintiff focuses much of his argument on the IA conducted following the domestic incident with his son. However, an investigation following a domestic dispute is "standard protocol" for the Agency (St. Germain Depo. at 61) and therefore does not support Plaintiff's argument of undeserved IAs. Furthermore, although Plaintiff testified that Black troopers are punished more than White troopers, (Ward Depo. at 64) he presented no statistical or other evidence to support this claim. Plaintiff cannot overcome summary judgment based on his own conclusions and speculations. Plaintiff must submit specific evidentiary support in order to show that a material issue of fact exists requiring trial. Alteri v. General Motors Corp., 919 F. Supp. 2d 92 (N.D.N.Y. 1996). In addition, although Ward's assertion that White colleagues did not receive similar discipline aided his *de minimus* prima facie showing, because his proffered comparisons did not involve domestic disputes, allegations of negligent investigations, (Pl.'s Opp. to Summ. Judg. at 25-27) or other misconduct similar to Plaintiff's, they cannot rebut Defendant's reasonable explanations. If other employees were not disciplined for conduct similar to Ward's, such evidence would tend to show pretext. However, Plaintiff does not produce such evidence. Here, Plaintiff's unsupported conclusions and conjecture regarding Defendant's motives cannot create a showing of pretext. Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to

16

resist a motion for summary judgment." <u>Bryant v. Verizon Comm. Inc.</u>, 550 F. Supp. 2d 513, 536

(S.D.N.Y. 2008).  Defendant's non-discriminatory explanations for Plaintiff's 2004 suspension are

rational, plausible, and supported by all of Defendants' depositions.  There is no question of

material fact for the jury to decide.  As to disparate treatment for discipline, Defendants' motion

for summary judgment is **granted**.

   However, Plaintiff does provide evidence for the crux of his claim, that the Agency's non-

discriminatory explanations for their refusal to transfer him to aviation are pretextual.  The

Defendants claim that Plaintiff was not reassigned between 1990 and 2000 because he did not have

the amount of flight time required by the insurance company. (Def.'s Memo. in Support of Summ.

Judg. at 41.)   However, Plaintiff provides evidence that the insurance company did not have fixed

flight time requirements (Samson Depo. at 35) and by 2000 Plaintiff had the required hours of

flight time. (CHRO Report Ex. 12 at Ex. A.)  Furthermore, the flight time requirements, as well as

Defendants' explanation that Plaintiff was under-qualified because he did not have a helicopter

license (Def.'s Memo. in Support of Summ. Judg. at 42) are rebutted by Plaintiff's contention that

he was willing to work in the aviation unit as an observer, (Pl.'s Opp. to Summ. Judg. at 11) a

position which does not require flight experience.  (<u>See</u> Samson Depo. at 20.)  Plaintiff further

argues that learning to fly a helicopter is not difficult for a trained fixed-wing pilot.  (<u>See</u> Ward

Depo.; Samson Depo.)

   Ultimately, the Defendants' non-discriminatory explanations are called into question by

testimony suggesting that race was a motiving factor in decisions regarding the aviation unit.

Ward claims that the affirmative action officer told him that: "the aviation unit is the last pristine

thing that they have.  It's the last thing that they have, the last thing that Blacks or minorities are

17

not in, and they want to keep that as clean as they can for as long as they can." (Ward Depo. at 83.) Furthermore, Stephen Samson, an Asian-American in the aviation unit, testified that the unit had a racially charged atmosphere and that he was treated differently because of his race.  (Samson Depo. at 60-62, 95, 104.)  Samson testified that "Jim and Matt explained they didn't want a Sargent to run this office because he's [Ward] an unsafe pilot that lies and he's Black."  (Id. at 89.)  Samson further testified that the Plaintiff was referred to using racial put-downs; Samson overheard the Plaintiff referred to as a "porch monkey." (Id. at 90.)

The above testimony is strong evidence of racially motivated decision making within the Agency, especially concerning hiring.  Although the comments were not necessarily made by those in charge of hiring, the speakers were present in at least some interviews and there is a strong inference that the members of the aviation unit would have some power in hiring decisions. Therefore, these overtly racist remarks rebut the Defendants' explanations for their failure to transfer Plaintiff.  Of course Defendants dispute Samson's testimony, but credibility is a question for the jury.  "[S]ummary judgment under Rule 56 ... may not be invoked where, as here, the [depositions of the principal witnesses] present conflicting versions of the facts which require credibility determinations." Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979) (per curiam); See also Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir.1986).  The evidence presented by each side creates a question of material fact as to whether Defendants' failure to transfer Plaintiff to the aviation unit was disparate treatment on the basis of race.  On this count, summary judgment is **denied.**

### 3.  Retaliation

Title VII prohibits an employer from "discriminating against any of [its] employees . . .

18

because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) that he was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."  Holtz v. Rockefeller & Co., 258 F.3d 62, 79 (2d Cir. 2001) (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)).

    Defendants do not dispute that Plaintiff was engaged in protected activity in filing his CHRO complaints in 2005 and 2006, that they were aware of this activity and that disciplines and suspensions are adverse employment actions. (Def.'s Memo. in Support of Summ. Judg. at 43.) However, Plaintiff was not subject to any discipline or suspension after 2005.  Plaintiff instead argues that his transfer to Troop K and an IA in the fall of 2006 were retaliatory adverse employment actions.  As discussed in the previous section, as the IA in 2006 did not lead to discipline (Ward Depo. at 9) it cannot be considered an adverse employment action.  In addition, unlike the transfer into the desirable aviation unit, Plaintiff's transfer from Troop C to Troop K cannot be considered an adverse employment action.  To establish an adverse employment action for purposes of a Title VII retaliation claim, Plaintiff must present evidence of a "materially adverse change in the terms and conditions of his employment."  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006) (internal citations omitted).  To constitute a "materially adverse" change in the terms of employment, "the employer's actions must be harmful

to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  Examples of such adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished responsibilities.  Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005).  "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (citing Kaluczky v. City of White Plains, 57 F.3d 202, 208 (2d Cir. 1995); Rutan v. Republican Party, 497 U.S. 62, 75 (1990).

Plaintiff was transferred from Troop C to Troop K in 2006.  However, this transfer was not materially adverse or harmful.  Plaintiff was not demoted, he maintained his position as a Sergeant and as a Supervisor.  Plaintiff makes no allegations that the transfer involved a loss of benefits, a change in responsibility, or a less distinguished position.  Furthermore, transfers between troops are common in the Agency.  (CHRO Investigation Ex. 2 at St. Germain interview 235-36.)

In addition, Plaintiff argues that he was retaliated against for the 2002 letter, written by his attorney, which alleged that Plaintiff was not transferred to aviation for "impermissible reasons." (Ex. I.) *Assuming arguendo* that this letter was protected activity, Plaintiff's argument still fails as he cannot show the necessary causal connection between the protected activity and an adverse employment action.  Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment, through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." De Cintio v. Westchester County

Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

As Plaintiff offers no direct evidence of retaliatory animus or fellow employees who engaged in similar conduct, he must rely primarily on the timing of adverse employment actions in relation to his 2002 letter.  Temporal proximity of the adverse action to the protected activity is a key indicator of retaliation.  See Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at *31-32 (D. Conn. 2006); Clark City School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).  The first possible adverse action following Plaintiff's letter is the 2003 IA and discipline based on the domestic incident between Plaintiff's and his son.  Plaintiff also cites his 2004 suspension following his report on McWilliams' accident and the Agency's failure to transfer him to the aviation unit following his "renewed effort in 2005" as retaliatory adverse employment actions. (Pl.'s Mem. in Opp. to Summ. Judg. at 31)

Plaintiff's attorney's letter is dated April 4, 2002. (Ex. I.)  The first adverse employment action against him was initiated on February 15, 2003.  Nine months therefore passed between the protected event and the alleged retaliation.  Without more, a nine month period cannot show causation, the fourth prong of a *prima facie* retaliation claim.  Although the Second Circuit found a causal connection in a case with direct evidence despite a five year lag between the protected activity and retaliation, Mandell v. County of Suffolk, 318 F.3d 368, 383 (2d Cir. 2003), in cases without direct evidence, three to four month periods have been found insufficient to create a casual connection between protected activity and adverse employment actions.  Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (finding a three month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 ( 7th Cir. 1992) (finding a four month period insufficient); Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (finding a three and half

month period insufficient).  Therefore, a nine month lag between even the first adverse

employment action (and more than three years to other alleged adverse employment actions),

without more, does not create a *prima facie* case for retaliation.

To the extent that Plaintiff also attempted to assert as retaliatory the various incidents cited

in support of his hostile environment claim, which is discussed in more detail below, Defendants

are correct that those allegations fail to rise to the level of adverse employment actions.  For an

employment action to be sufficiently adverse, "there must be a link between the discrimination and

some tangible job benefits such as compensation, terms, conditions or privileges of employment."

Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  An adverse employment action is one that is

"more disruptive than a mere inconvenience or an alteration of job responsibilities."  Galabya v.

New York City Bd. of Ed., 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted).  Thus,

Plaintiff's complaints concerning yelling on the job, being ignored and IAs without discipline do

not constitute materially adverse employment actions.

### 4. Hostile Work Environment

A successful hostile work environment claim requires conduct that is sufficiently severe or

pervasive to create an abusive workplace permeated with discriminatory intimidation, ridicule and

insult that unreasonably interfere with an employee's work performance.  Harris v. Forklift

Systems, Inc., 510 U.S. 17, 21 (1993); Patterson v. County of Onieda, N.Y. 375 F.3d 206, 227 (2d

Cir. 2004).  There must also be a specific basis for imputing that hostile conduct to the employer.

Id.  Hostile work environment claims have both objective and subjective components. Petrosino v.

Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004).  The discriminatory conduct must be so pervasive

that a reasonable person viewing the "totality of the circumstances" would recognize an

"objectively hostile or abusive work environment." Id. at 221-22.  Factors relevant to determining whether a workplace is objectively permeated with discrimination include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and whether any psychological harm resulted. Patterson, 375 F.3d at 227;  Williams v. County of Westchester, 171 F.3d 98, 100-01 (2d Cir. 1999).   Furthermore, the conduct that creates a hostile work environment must be motivated by the plaintiff's protected characteristic.   Khan v. HIP Centralized Lab. Servs., 2007 U.S. Dist. Lexis 23721 at *13-14 (E.D.N.Y. 2007).

"[T]he ordinary tribulations of the workplace, such as sporadic use of abusive language"are not actionable under Title VII. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Title VII does not establish a "general civility code for the American workplace." Burlington Northern and Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir 1999).  Abusive conduct of such severity and/or pervasiveness as to create a hostile environment which interferes with an employee's work, Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002), and permeates the workplace with discriminatory intimidation, ridicule and insult of such severity and pervasiveness as reasonably to be viewed as altering the conditions of employment is necessary. Demoret v. Zegarelli, 451 F.3d 140 (2d Cir. 2006); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

The core of Plaintiff's hostile environment claim is the "coercion of Mattson and St. Germain relative to Ward's findings in the McWilliams motor vehicle accident investigation" as well as Mattson's demeaning conduct. (Pl.'s Memo. in Opp. to Summ, Judg. at 33.)  Plaintiff argues that there was a  hostile environment at the Agency both at Troop H under the supervision

of Mattson and at Troop C.  Plaintiff claims that he was coerced into finding that Trooper McWilliams' car accident was the result of human error. (Ward Depo. at 109.)  He testified that Defendant Mattson treated him and other Black officers in a demeaning manner.  Ward alleges that he was often yelled and cursed at and alternately treated as if he was not in a room.  (Ward Depo. at 110-118.)  Plaintiff testified that Mattson berated him in front of the officers that Plaintiff supervised, undermining his authority and making his supervisory work more difficult. (Ward Depo. at 118.)  Plaintiff stated that he was made to write out explanations of his actions ("explanatories") while other officers were not, which further undermined his authority.  (Ward Depo. at 135, 156.)  He further argued that the six internal investigations (IA/AI History Ex. 26) and several negative performance evaluations (Ward Depo. at 153) were undeserved and contributed to a generally hostile and racially charged environment.

Although any one of these alleged acts may not be so severe as to be abusive when examined alone, a "hostile environment claim is different in kind from discrete acts.  [Its] very nature involves repeated conduct." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  Repetition increases severity and Ward has testified that the conduct was so pervasive as to change the conditions of his employment.  Viewing the ambiguities and inferences in the light most favorable to Plaintiff as the non-moving party, United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), the Court concludes that there is a material question of fact as to whether Plaintiff was subjected to an objectively hostile or abusive work environment on account of his race, color or national origin.  Plaintiff describes continuously abusive conduct on the part of his supervisors.  As much of the conduct undermined Plaintiff's authority, a jury could find that it "altered the conditions of employment" by making Plaintiff's job as Supervisor more difficult.  Furthermore,

looking at the totality of the circumstances, a reasonable fact finder could conclude that the alleged misconduct was "sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello 294 F.3d 365, 374 (2d Cir. 2002). It is a material question of fact whether the alleged conduct occurred and whether it was so frequent and humiliating as to constitute a hostile work environment.

Plaintiff must next illustrate that the conduct was directed at him because of his race. Plaintiff must show "at least some circumstantial connection to the plaintiff's status as a member of a protected class." Ellenbogen v. Projection Video Servs., 2001 U.S. Dist Lexis 8852 at *32 (2001). As Plaintiff asserts, Defendant Mattson's role in the hostile environment is probative, as a forum was conducted concerning Mattson's treatment of minorities. (Ward Depo. at 137-138; Mattson Depo. at 104.) The fact that other employees made race-based complaints supports Ward's allegation of a racial motive for the hostile environment. Plaintiff further alleges a general atmosphere of discrimination in the Agency, evidenced by racial remarks in the aviation unit (Samson Depo. at 60-62, 89, 90, 95, 104; Ward Depo. at 83.) As evidence of a discriminatory intent can be difficult to prove, this circumstantial evidence is sufficient to create an issue of material fact for this prong of the test. See Holcomb v. Iona Coll., 521 F.3d 130 (2d. Cir. 2008) (urging caution when granting summary judgment in a discrimination case where the merits turn on a dispute as to the employer's intent); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (holding that as direct evidence of intent will rarely be available, circumstantial evidence found in depositions may create an issue of material fact).

The final prong in the *prima face* case for a hostile work environment is a basis for employer liability. Defendant unsuccessfully asserts the *Faragher-Ellerth* defense to employer

liability.  "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence-which defense comprises the two necessary elements that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm."  Farragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Inds, Inc. v. Ellerth, 524 U.S. 742 (1998).

Here, the only evidence Defendant presents of reasonable care is the existence of an affirmative action office.  Defendant does not present evidence of the activities of this office.  The existence of this office alone cannot constitute reasonable care by a preponderance of the evidence. Furthermore, Plaintiff presents evidence that he did utilize this office but neither side illustrates whether the office took steps to investigate or remedy Plaintiff's complaints. (Ward Depo. at 83.) Although the fact that the Agency organized a meeting to address complaints regarding Defendant Mattson should be regarded as corrective action, the record does not reflect the outcome of the meeting or any follow-up.  Defendant does not show reasonable care by a preponderance of the evidence and there is a material question of fact as to the alleged race based hostile work environment.  Therefore, summary judgment is **denied** as to this count.


### C.      Count Two: Connecticut General Statutes § 46a-58

As Plaintiff withdrew this count, it is not necessary to address this claim.  Count Two is **dismissed.**

**D.      Counts Three and Four: 42 U.S.C. 1981 and 42 U.S.C. 1983**

As noted above, due to a failure of service, all of Plaintiffs' claims against the individual

Defendants in their individual capacities fail.  Therefore, it is only necessary to address Plaintiff's

claims under 42 U.S.C. 1981 and 1983 against the State (and its Agencies) and the individual

Defendants in their official capacities.

Plaintiff concedes that sovereign immunity as conferred by the Eleventh Amendment bars

suits against Connecticut and the Agency under 42 U.S.C. 1981 and 1983.  (Pl.'s Memo. in Opp. to

Summ. Judg. at 22.)  Furthermore, the "Eleventh Amendment bars suit against state officials when

the state is the real, substantial party in interest."  Pennhurst State School & Hosp. v. Halderman,

465 U.S. 89, 101 (1984).  In a suit against a State employee in his official capacity for money

damages, the state is in fact the party in interest.  It is settled law that suits against state officials in

their official capacity for money damages are barred by the Eleventh Amendment.  Id. at 101-102.

Accordingly, summary judgment is **granted** as to counts three and four of the complaint.


**E.      Count V: Intentional Infliction of Emotional Distress**

To succeed on a claim of intentional infliction of emotional distress Plaintiff must show:

"(1) that the actor intended to inflict emotional distress; or that he knew or should have known that

emotional distress was a likely result of his conduct; (2) that the conduct was extreme and

outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the

emotional distress sustained by the plaintiff was severe."  Petyan v. Ellis, 200 Conn. 243, 253

(1986).

As Plaintiff notes, the essential element of the claim is whether the alleged conduct is

27

considered "outrageous" according to the standards of a civilized community.  "Only where the

conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community" will the second prong of the case for intentional infliction of emotional distress be

satisfied. <u>Appleton v. Bd. of Ed. of Town of Stonington</u>, 254 Conn. 205, 211 (2000).  "Conduct on

the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings

is insufficient to form the basis for an action based upon intentional infliction of emotional

distress."  <u>Id</u>.

Here, there is simply no alleged behavior that a rational trier of fact could find meets this

standard.  <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).  Plaintiff's

claim for intentional infliction of emotional distress is based on investigations into his professional

conduct, discipline as the result of those investigations, failure to transfer to a desired position,

negative evaluations and transfers without cause.  (Ward Depo. at 162-196)  While such conduct

may lead to unhappy employees, and may even be motivated to hurt, it is within the bounds of

normal workplace behavior.  Discipline, evaluations and transfers are all part of the workplace

experience.  Plaintiff also asserts that his supervisor yelled at him in public, circumvented him in

the chain of command, and forced him to change his conclusions in a report.  Again, while the

alleged conduct could reasonably insult Plaintiff and even make a workplace hostile, such conduct

is often encountered and tolerated in the workplace.  The alleged conduct simply is not "extreme

and outrageous."  Connecticut courts have continuously found that even harsh and unnecessary

discipline or pervasive yelling in the workplace does not constitute intentional infliction of

emotional distress.[5]  Accordingly, summary judgment is **granted** as to count five.


IV.   **CONCLUSION**

Defendant's motion for summary judgment [Doc. No. 54] is **granted in part and denied in part**.  In sum, the case will move forward on Plaintiff's remaining claims under Title VII for disparate treatment for failure to transfer and hostile work environment.


SO ORDERED.

Dated at New Haven, Connecticut, January  21 , 2009.


        /s/
Peter C. Dorsey, U.S.D.J.

---

[5]  Connecticut courts have held that similar conduct and even conduct less expected and less tolerated in the workplace does not meet the legal threshold of "extreme and outrageous".  See Armstrong v. Chrysler, 1998 U.S. Dist. Lexis 9357 (D. Conn. 1998) (holding allegations that defendants called plaintiff "You-Who," criticized, insulted, and embarrassed her on a daily basis, took away her authority, frequently declared her incompetent, and demeaned her professional ability in the presence of her superiors and subordinates did not meet the required threshold of outrageousness); Valencia v. St. Francis Hosp. & Med. Ctr., 1996 Conn. Super. LEXIS 894 (Conn. Super. Ct. 1996) (holding that conduct was not extreme and outrageous where defendant "grabbed plaintiff's arm in front of patients and co-workers, pulled her in a back room and yelled at her"); Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 552-53 (D. Conn. 1996) (concluding that conduct was not extreme and outrageous where employee was suddenly terminated and physically escorted from the building like a criminal) aff'd, 104 F.3d 355 (2d Cir. 1996); Barbuto v. William Backus Hosp., 1995 Conn. Super. LEXIS 1184 (Conn. Supp. Ct. 1995) (holding that defendant's conduct of removing plaintiff from a work-shift schedule and suspending her for two days was not extreme and outrageous).